IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROVETTORY A. CARTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-371-GMS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Angela Pinto Ross, Esquire, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nora Koch, Acting Regional Chief Counsel and Beverly H. Zuckerman, Assistant Regional Counsel, Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

**SLEET, District Judge**

## I. INTRODUCTION

Plaintiff Rovettory A. Carter ("Carter") appeals from a decision of defendant Carolyn W. Colvin, Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434 and 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently before the court are the parties' cross-motions for summary judgment. (D.I. 13, 18). For the foregoing reasons, Carter's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## II. BACKGROUND

### A. Procedural History

Carter filed an application for DIB and SSI on May 19, 2011 and May 24, 2011, alleging disability as of March 14, 2011 as a result of hepatitis C, neuropathy in both feet, diabetes, hypertension, stress and depression. (Tr. 178-188, 246). After her claim was denied initially and on reconsideration, Carter then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 18, 2013. (Tr. 35-66, 119-123, 128-133, 139-140). After the hearing, Carter amended her onset date of disability to July 1, 2012, when she was no longer working in any capacity. (Tr. 238). The ALJ issued an unfavorable decision dated January 17, 2014. (Tr. 16-34). The Appeals Council denied Carter's request for review on April 17, 2015, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Having exhausted her administrative remedies, Carter filed this action. (D.I. 1).

### B. Medical History

Carter was born in March 1956. (Tr. 67). She was 56 years old at the time of her amended onset date of disability in 2012, and was 57 years old when the ALJ rendered a decision in her case in 2014. She received her GED in 1972. (Tr. 247). Her past relevant work was as a dispatch clerk and medical transcriber. (Tr. 247). The issues on appeal involve the causes of Carter's foot pain and the presence (or absence) of edema, fatigue, depression, anxiety, and an antalgic gait. Following are the facts from Carter's medical history related to those issues.

#### 1. Medical Records Before Carter's Amended Disability Onset Date.

From July 2010 through June 2011, Carter received treatment from Yvette Gbemudu, M.D., for hypertension and complaints of right foot pain. (Tr. 293-313, 317-19). Carter characterized the pain as stabbing and burning, and claimed that it had been occurring for years. (Tr. 311). A June 2010 physical examination revealed bilateral pitting edema. (Tr. 312). In February 2011, an examination of the lower extremities revealed no edema. (Tr. 309). In March 2011 and June 2011, examinations noted bilateral pitting edema of the lower extremities. (Tr. 300, 304). Carter denied fatigue at each of these examinations. (Tr. 299, 304, 308, 311).

From February 2011 through June 2011, Alexander Terris, D.P.M., a podiatrist, treated Carter for peripheral neuropathy with bilateral foot pain. (Tr. 325-26, 333-44). Carter complained of burning on the soles of both feet that had been going on for 2 years or more. (Tr. 325). She had seen several other doctors who provided palliative treatment, including debridement of the callouses, oral antifungal therapy, and a recommendation for extra depth shoes. (*Id.*). None of the treatments resolved the "burning" sensation. (*Id.*). Carter denied being diabetic, but reported that another doctor told her she was pre-diabetic, and she had not had any testing since then. (*Id.*). In February 2011, Carter reported "significant improvement" with Neurontin. (Tr. 333). In April

2011, she reported that she was doing well, although her pain was starting again. (Tr. 335). Dr. Terris increased Neurontin. (Tr. 335). In May 2011, Carter reported improvement on the left foot but complained that her right foot was still painful. (Tr. 338). Dr. Terris treated the pain by debriding plantar verruca. (Tr. 338-39). In June 2011, Carter reported that everything was feeling better except for a spot under the 5th metatarsal area. (Tr. 341).

On July 12, 2011, Dr. Gbemudu saw Carter for a preoperative evaluation. (Tr. 358). Harold Gruber, M.D., planned to perform right foot surgery on the 1st and 5th right toes to straighten them and decrease pain. (*Id.*). Carter felt well with minor complaints and denied fatigue. (*Id.*). A physical examination revealed trace edema. (Tr. 359). Diagnoses included pain in joint, ankle/foot; hypertension; prediabetes; and hepatitis C, chronic viral. (*Id.*). On July 13, 2011, Dr. Gruber performed a right first and fifth metatarsal osteotomy. (Tr. 371). On July 20, 2011, Carter complained to Dr. Gruber of mild discomfort with improvement from last week. (Tr. 425). Dr. Gruber observed that minimal edema was present. (Tr. 426). X-rays of the right foot dated July 26, 2011 showed that hardware was intact; alignment was unchanged since July 13, 2011; and a splint was in place. (Tr. 384). Dr. Gbemudu performed a physical examination on July 26, 2011, which revealed that Carter's gait and posture were normal. (Tr. 356). Carter denied fatigue, anxiety, and depression. (*Id.*).

On August 11, 2011, Vandana Long, M.D., saw Carter for evaluation of hepatitis C. (Tr. 363-65). A physical examination revealed no edema and normal gait. (Tr. 364). A mental status examination revealed that Carter was oriented X3 (to person, place, and time), and that her mood and affect were appropriate. (*Id.*).

On September 19, 2011, Anthony W. Clay, D.O., a cardiologist, saw Carter for complaints of chest pain and shortness of breath. (Tr. 411-13). Carter acknowledged that she continued to

3

smoke ¾ of a pack of cigarettes per day. (Tr. 411). An examination revealed no presence of anxiety, depression, fatigue, or insomnia. (Tr. 412). The examination also revealed trace right ankle edema. (*Id.*).

On October 7, 2011, Carter told Dr. Gruber that she was feeling good but still had some discomfort along the outside/bottom of the right foot. (Tr. 431). Dr. Gruber noted that minimal edema was present and recommended orthotics. (Tr. 432). On October 25, 2011, Carter stated that she was having pain along the bottom of her foot but that she had improved since pre-op. (Tr. 433). Dr. Gruber casted her for orthotics. (Tr. 434).

On November 3, 2011, Helen Karalis, D.O., saw Carter for treatment of hypertension. (Tr. 462-64). Carter complained of a burning sensation on the right mid-foot, and explained that she was being followed by a podiatrist. (Tr. 462). A physical examination revealed normal gait, no edema in the lower extremities, and normal strength and tone in the lower extremities. (Tr. 463).

On December 1, 2011, Dr. Gruber ordered x-rays of the right foot which revealed that the osteotomy had healed, the screw had no fractures, that there was no acute fracture or dislocation, and that there was no stress fracture. (Tr. 479). The impression was healed surgery. (*Id.*). On December 9, 2011, Carter stated that the right foot area under the great toe felt good, although she still had discomfort along the bottom of the fifth digit and pain along the bottom of the left foot. (Tr. 437). A physical examination revealed keratotic lesions on the right and left foot. (Tr. 438). Neuro-vascular status was grossly intact. (*Id.*). Dr. Gruber recommended paring of lesions and continued use of orthotics. (*Id.*).

The record contains additional progress notes from Gastroenterology Associates, where Dr. Long and Stephanie Bey, P.A., a physician's assistant, continued to follow Carter for hepatitis C. (Tr. 440-51, 455-58, 660-63, 665-68). Examinations in April 2011, June 2011, August 2011,

4

January 2012, and February 2012 revealed no edema, a normal gait, and no presence of depression or anxiety.[1] (Tr. 441-42, 445-46, 449-50, 456-57, 468, 605, 666-67, 670-71). From April 2011 to January 2012, Carter also denied fatigue. (Tr. 441, 445, 449, 456, 670). In February 2012, P.A. Bey noted that fatigue from treatment side effects was present and improving. (Tr. 665). In April 2012, Carter stated that she felt fatigue and was under a great deal of stress due to the loss of her home and several deaths in her family. (Tr. 660). A mental status examination revealed that she was alert, in no acute distress, and oriented X3 with appropriate mood and affect. (Tr. 661-62). A physical examination revealed normal gait and trace edema in the bilateral lower extremities. (Tr. 662).

On May 17, 2012, Anjala Pahwa, M.D., saw Carter for goiter and complaints of depression and anxiety. (Tr. 708-11). Carter told Dr. Pahwa that she had to stop treatment for hepatitis C due to stress associated with the loss of her house, financial difficulty, raising her granddaughter, and her sister's diagnosis of AIDS. (Tr. 708). She denied suicidal ideation and stated that she was trying a find a job. (*Id.*). Her mood and affect were slightly down; there was no evidence of thought disorder; and she was anxious about her "stressful situation." (Tr. 710). Dr. Pahwa started Carter on Prozac and Trazadone. (Tr. 715). A physical examination was negative for edema. (Tr. 709). On May 29, 2012, Carter told Dr. Pahwa that Prozac was helping with anxiety, and that she had no problems with her medication. (Tr. 714).

---

[1] These results were consistent with an examination of Carter in January 2012 by Lisa Lynn Capuano-Oslon NP of Family Medicine at Greenhill which revealed a normal gait, no edema, and no presence of depression, anxiety, or agitation. (Tr. 706). Nurse Capuano-Oslon told Cater that she could participate in an exercise program. (*Id.*).

On May 18, 2012, Dr. Gruber saw Carter for complaints of pain along the bottoms of both feet. (Tr. 509-10). She stated that the area along the bottom of the right great toe had improved with surgery but claimed the other area along the right foot was still painful. (Tr. 509).

On June 28, 2012, Ripudaman Hundal, M.D., an endocrinologist, evaluated Carter for thyroid nodule. (Tr. 627). Carter described her health as good. (*Id.*). She denied gait disturbance, abnormal balance, anxiety, and depression. (*Id.*). A physical examination revealed normal range of motion, strength, gait, and mobility. (Tr. 629). Her mood and affect were appropriate. (*Id.*).

### 2. Medical Records After Carter's Amended Disability Onset Date.

On August 24, 2012, Dr. Gruber saw Carter for complaints of pain along the bottoms of both feet. (Tr. 511). Dr. Gruber recommended sharp paring of lesions and that she wear her orthotics. (Tr. 512). On October 12, 2012, Carter's complaints were much the same. (Tr. 513). Dr. Gruber noted that she presented without her orthotics, which she had packed away. (*Id.*).

On September 21, 2012, Dr. Pahwa saw Carter for follow-up care, at which time she reported that she was homeless and trying to find work. (Tr. 716). She stated that she was seeing a psychiatrist who had started her on medication and was doing better with depression on Cymbalta. (*Id.*). Her blood pressure started going up and her feet started swelling more when she ran out of blood pressure medication, but her symptoms decreased when she restarted her blood pressure medication. (*Id.*). A physical examination was negative for edema. (Tr. 718). A mental status examination revealed no depression, anxiety, or agitation. (*Id.*). On October 22, 2012, Carter told Dr. Pahwa that she was still looking for work. (Tr. 722). Dr. Pahwa told Carter she could work if she found a job. (Tr. 724). A physical examination found a normal gait and no edema. (*Id.*)

6

On November 9, 2012, Raafat Z. Abdel-Misih, M.D., evaluated Carter for a thyroid abnormality. (Tr. 620). A physical examination showed an enlarged thyroid gland with multiple nodules. (*Id.*). Her extremities showed no edema. (*Id.*). After reviewing an ultrasound which showed a multinodular goiter, Dr. Abdel-Misih recommended a thyroidectomy. (Tr. 621). On November 16, 2012, Dr. Pahwa performed a physical examination which was negative for edema. (Tr. 739).

On January 11, 2013, Ernest Troisi, D.P.M., a podiatrist, saw Carter for follow-up care, at which time she presented with decreased pain in the second and left third interspace with continued pain in the right forefoot. (Tr. 634). Her neuropathy had gotten minimally better with Neurontin. (Tr. 634). A physical examination revealed painful lesions submetatarsal 1 and 5 due to structural abnormality, peripheral neuropathy with decreased sensation bilaterally, and positive Mulder's sign consistent with interdigital neuromas. (Tr. 634). Debridement of lesions was performed. (*Id.*). Dr. Troisi gave Carter a cortisone injection, and recommended continued conservative care or elective foot surgery. (*Id.*).

On January 11, 2013, Dr. Pahwa cleared Carter for thyroid surgery. (Tr. 741). A physical examination was negative for edema. (Tr. 743). She denied fatigue. (Tr. 742). A mental status examination revealed no depression, anxiety, or agitation. (Tr. 742-43). Another examination conducted by Dr. Pahwa on February 21, 2013 also revealed no edema, depression, or anxiety. (Tr. 757).

On February 15, 2013, Dr. Abdel-Misih noted that Carter had a benign multinodular goiter with no malignancy, and that she had a very satisfactory recovery. (Tr. 619). Dr. Abdel-Misih advised Carter to resume full activity. (*Id.*). When Dr. Abdel-Misih saw Carter for follow-up care on March 27, 2013, she was totally asymptomatic. (Tr. 618).

On April 12, 2013, Carter was seen at Gastroenterology Associates for hepatitis C. (Tr. 657-59). Her only complaint was related to occasional right upper quadrant discomfort that did not interfere with her daily activities. (Tr. 657). Cater reported fatigue. (*Id.*). A physical examination revealed a normal gait, no edema overall and trace edema on a lower extremity. (Tr. 658-59). A mental status examination revealed no depression or anxiety. (Tr. 658). On April 30, 2013, Dr. Pahwa noted no presence of depression or anxiety. (Tr. 762).

On May 13, 2013, Karen Rockwell, NP, saw Carter for a thyroidectomy follow up. (Tr. 623). Carter described her general health status as good, and reported that her exercise involved aerobic activity three times a week. (*Id.*). Nurse Rockwell noted that Carter had done well postoperatively. (*Id.*). She denied fatigue, gait disturbance, abnormal balance, anxiety, and depression. (*Id.*). A physical examination revealed normal range of motion, strength, gait, and mobility. (Tr. 625). Her mood and affect were appropriate. (Tr. 625). Nurse Rockwell encouraged her to do regular exercise. (*Id.*).

Dr. Pahwa saw Carter on May 14, 2013, at which time she asked Dr. Pahwa to complete disability forms. (Tr. 764-67, 771). A physical examination was normal except for complaints of pain and tenderness on the bottom of the right foot, calluses and pain in the left foot, and decreased sensation to the feet bilaterally. (Tr. 765). There was no evidence of edema. (Tr. 764). A mental status examination revealed no depression, anxiety, or agitation. (Tr. 765).

On July 17, 2013, Dr. Pahwa saw Carter for follow up of thyroid issues. (Tr. 773). A physical examination was normal except for trace edema and decreased sensation in the feet. (Tr. 774-75). Carter said she had no depression, anxiety, or agitation. (Tr. 775). On September 6, 2013, Dr. Pahwa saw Carter for complaints of fatigue and body aches. (Tr. 781). Carter reported that her mood was good on Prozac. (*Id.*). An examination revealed no presence of depression,

anxiety, or edema. (Tr. 782-83). Dr. Pahwa noted that Carter had foot pain but did not want surgery. (Tr. 783).

On September 18, 2013, Carter saw Nurse Rockwell for follow up. (Tr. 676-79). Carter described her general health status as good. (Tr. 676). Her exercise consisted of occasional aerobic activity three times per week. (*Id.*). She denied fatigue, gait disturbance, abnormal balance, anxiety, and depression. (Tr. 676-77). She complained of pain in three left toes but had normal range of motion, strength, gait, and mobility. (Tr. 678).

On December 5, 2013, Dr. Pahwa saw Carter for a PAP test. (Tr. 788). Carter complained of pain in her legs, feet, and hands but denied fatigue. (Tr. 789). A physical examination was normal except for 1+ edema, right thumb trigger finger, possible swelling in the left hand, a painful right foot callous, and decreased sensation in the feet. (Tr. 790-91). A mental status examination was normal. (Tr. 791). Carter came with a form for social security. (Tr. 791).

On December 11, 2013, Dr. Pahwa saw Carter to finish disability paperwork. (Tr. 794). At that time, Carter walked with an antalgic unsteady gait, and could not straighten her right thumb. (Tr. 795). Dr. Pahwa noted that Carter had pain due to calluses and prior scarring on both feet from surgery. (*Id.*). A mental status examination revealed that Carter was oriented to time, place, and person, and that she had no depression, anxiety, or agitation. (*Id.*).

### C. Medical Opinion of Treating Physician

Since her amended onset date of disability, Carter treated with her primary care physician, Dr. Pahwa, who completed two medical statements related to Carter's disability. On December 5, 2013, Dr. Pahwa completed a Medical Prognosis Statement, and on December 11, 2013, she completed a Physical Medical Source Statement. (Tr. 648-651; Tr. 700-702). In the Medical Prognosis Statement, Dr. Pahwa described Carter's conditions as untreated hepatitis C (not tolerant

9

to treatment), depression, and pain in multiple joints. (Tr. 700). Regarding Carter's functioning, Dr. Pahwa stated the following: able to sit for up to four hours; unable to stand for four hours; able to climb a flight of stairs or walk a 100 yards; and able to lift 5 pounds. (Tr. 701). Dr. Pahwa believed that Carter had manipulative limitations in reaching, handling, fingering and feeling. (*Id.*). She noted that Carter had right hand problems, SI joint deformities, and neuropathy and pain in her feet. (*Id.*). Dr. Pahwa stated that Carter's leg and foot pain was permanent with no improvement since her surgery in July 2011. (Tr. 702)

In the Physical Medical Source Statement, Dr. Pahwa stated that Carter had the following diagnoses: hypertension, chronic hepatitis C, depression, anxiety, peripheral neuropathy, intermittent dizziness, hypothyroid, intermittent migraines, back pain, multiple joint pains and edema. (Tr. 648). Dr. Pahwa noted that Carter took gabapentin for foot pain and amitriptyline for insomnia and headaches. (*Id.*). Dr. Pahwa believed that Carter was limited to walking less than one and half blocks due to pain. (Tr. 649). In an eight hour day, she opined that Carter was limited to two hours sitting and less than two hours standing and walking. (*Id.*). Carter would require the following: a job that permitted shifting positions at will; periods of walking; and unscheduled breaks two to three times a day lasting between fifteen to twenty minutes due to foot pain and cramps in legs. (*Id.*). Dr. Pahwa stated that Carter needed to elevate her legs twenty-five percent of the workday, at knee level, due to mild edema and burning leg pain. (Tr. 650). Carter rarely could lift less than ten pounds, stoop, crouch, squat and climb stairs and has limitations in using her right hand. (*Id.*). Lastly, Carter would likely be off task twenty-five percent of the workday due to symptoms and would be absent more than four days per month. (Tr. 651).

### D. Hearing Testimony

Carter testified that she was unable to work because her feet hurt constantly; she claimed that she had to put her feet up and wear slippers rather than shoes. (Tr. 48-49). She claimed that she experienced fatigue due to hepatitis. (*Id.*). She stated that she was pre-diabetic and had a thyroid problem. (Tr. 49). She had custody of a twelve-year-old granddaughter since the age of nine months. (Tr. 52). She took her granddaughter to the school bus in the morning and helped her with her homework. (Tr. 53). She drove to appointments. (Tr. 54). She acknowledged that she is "pretty good at remembering." (*Id.*).

The VE described Carter's past relevant work as follows: dispatch clerk—sedentary and semiskilled; and medical transcriber—sedentary and skilled. (Tr. 61). In describing her past relevant work, Carter testified that she did not have to lift or carry anything and was permitted to sit most of the time. (Tr. 46-48). The ALJ asked the VE to assume that an individual with Carter's vocational profile (age, education, work experience) could lift and carry 10 pounds frequently and 20 pounds occasionally; could sit for six hours and stand and walk a total of three hours in an eight-hour workday; could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; could not climb ladders; and could not be exposed to extreme cold, heat, humidity, gas, dust, fumes, odors, vibration, moving machinery, or unprotected heights. (Tr. 61). The VE testified that the individual could perform Carter's past relevant work as a dispatch clerk, and medical transcriber. (Tr. 61-62).

### E. ALJ's Decision

The ALJ determined that Carter had severe interdigital neuroma, peripheral neuropathy, chronic hepatitis C, and status post thyroidectomy. (Tr. 21). The ALJ found that Carter's depression, anxiety, and right trigger finger were non-severe. (Tr. 21-22). None of Carter's

impairments or combination of impairments met or medically equaled a listed impairment. (Tr. 22). The ALJ concluded that Carter had the residual functional capacity ("RFC") to perform sedentary work with the following additional restrictions: no more than occasional climbing of stairs, balancing, stooping, kneeling, crouching or crawling; no climbing of ladders or exposure to extreme cold/heat, humidity, gas, dust, fumes, odors, vibration, moving machinery or unprotected heights. (*Id.*). The ALJ concluded considering Carter's age, education, work experience, and residual functional capacity, that she was capable of performing her past work as a dispatch clerk and medical transcriber. (Tr. 27).

### III. STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). If the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought

pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

Carter makes several arguments in support of her motion for summary judgment. First, according to Carter, the ALJ erred in assigning little weight to the opinion of her treating physician, Dr. Pahwa. Second, the ALJ formulated an RFC that failed to include all of her credibly established limitations. Finally, the RFC for sedentary work was defective because it relied on the VE's testimony that Carter was capable of light work. Each of these arguments will be addressed in turn.

### A. Weight of Treating Physician's Opinion

Carter claims that the ALJ erred in giving "little weight" to the opinion of her treating physician, Dr. Pahwa. (D.I. 14 at 11-15). If a treating physician's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight. 20 C.F.R. §404.1527. Thus, an ALJ may give little weight to a physician's opinion that is inconsistent with the medical evidence of record and with her own examination findings. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (holding that an unsupported diagnosis is not entitled to significant weight); *Hall v. Comm'r of Soc. Sec.*, 218 F.App'x 212, 215 (3d Cir. 2007). If the ALJ does not give a treating physician's opinion controlling weight, she must provide her reasons. 20 C.F.R. §404.1527.

Here, the ALJ gave "little" weight to Dr. Pahwa's opinion, because it was inconsistent with her own treatment records as well as other objective medical evidence. (Tr. 26). The ALJ provided several well-supported examples. First, although Dr. Pahwa claimed that Carter needed to keep

13

her legs elevated due to edema, her examinations over the previous two year period, as well as other examinations in the record, consistently showed no edema.[2] (*See* Tr. 441, 620, 706, 709, 718, 724, 739 (showing no edema throughout 2012); 743, 757, 764, 782 (showing no edema throughout 2013)). On the few occasions when physicians noted trace edema, it did not appear in later appointments. (Tr. 659 (trace edema in lower extremities in April 2013); Tr. 623 (no edema in May 2013); Tr. 774 (mild or trace edema in July 2013); 782 (no edema in September 2013)).

Second, the ALJ noted that Dr. Pahwa cited "chronic fatigue" in support of her restrictions. But objective findings from her own examinations as well as other physician's examinations from 2011 to 2013 consistently found no fatigue. (*See* Tr. 358, 441, 445, 450, 449, 456, 623, 676, 742). For some of the times when Carter did report fatigue (*see* Tr. 658, 660, 665), she also reported no fatigue around the same time. (*See* Tr. 676 & 781 (reporting "some fatigue" to Dr. Pahwa on September 6, 2013, but denying fatigue to a different physician on September 18, 2013); Tr. 789 & 795 (denying fatigue to Dr. Pahwa on December 5, 2013, but being diagnosed with "chronic fatigue" on December 11, 2013).[3] The frequent reports of no fatigue is inconsistent with a diagnosis of *chronic* fatigue, particularly when one of the reports is within a week of the diagnosis.

---

[2] Dr. Pahwa also opined that Carter needed to keep her legs raised for the additional reason of "burning and pain in the legs." (Tr. 650). Carter claims this is a reference to her neuropathy, a condition well supported by evidence in the record. (D.I. 14 at 21). Even if this additional reason is supported by the record, Dr. Pahwa's opinion regarding Carter's edema is still inconsistent with the record, giving the ALJ reason to discount the weight of the opinion accordingly.

[3] Carter claims that there is substantial evidence in the record that she had difficulty sleeping which supports the diagnosis of chronic fatigue. (D.I. 14 21-22). But Dr. Pahwa attributed Carter's chronic fatigue to her hepatitis C, not insomnia. (*See* Tr. 648 (stating "chronic fatigue due [to] Hep C")). Accordingly, evidence that Carter had difficulty sleeping does not negate the fact that Dr. Pahwa's diagnosis of chronic fatigue due to hepatitis C is inconsistent with the record.

14

Third, in the medical examination conducted for the purpose of completing the disability paperwork, Dr. Pahwa noted an antalgic unsteady gait, despite consistent reports of a normal gait before December 2013. (Tr. 795 (finding an antalgic gait), 442, 446, 450, 457, 463, 468, 605, 623, 627, 658, 662, 666, 671, 677, 706, 724 (reporting a normal gait)). There is no evidence in the record suggesting a reason why Carter's gait would suddenly change from normal, as last reported in September 2013, to antalgic in December 2013. (Tr. 677). As the ALJ correctly observed, several of Dr. Pahwa's findings were much more significant than what was noted before she conducted a medical examination for the purposes of completing the disability paperwork. (Tr. 27).

Dr. Pahwa was, however, consistent with her past treatment notes when she opined in the Medical Source Statement that Carter was "capable of low stress work."[4] (Tr. 651). Dr. Pahwa had similarly opined in October 2013 that Carter can work if she finds a job. (Tr. 724). The ALJ's adopted this portion of Dr. Pahwa's decision by concluding that Carter is capable of a sedentary job. Accordingly, the ALJ gave proper weight to those portions of Dr. Pahwa's opinion supported by substantial evidence, and gave adequate explanations for those portions of Dr. Pahwa's opinion she did wholly adopt.

Carter takes issue with another one of the several reasons the ALJ provided for discounting Dr. Pahwa's opinion. Specifically, the ALJ stated that the pain in Carter's feet was "most likely due to her callouses, not neuropathy, and these callouses have responded to treatment." (Tr. 26).

---

[4] According to Carter, although Dr. Pahwa found her capable of work, it was only "very restricted part-time employment." (D.I. 14 at 22). The court, however, finds no support for this assertion in either Dr. Pahwa's Medical Source Statement or Medical Prognosis, because neither document mentions part-time work.

15

Carter argues that the ALJ improperly relied on her own lay opinion in reaching this conclusion. (D.I. 14 at 19). There is, however, medical evidence in the record supporting the ALJ's reasoning. Dr. Pahwa opined that Carter would be limited during the work day because her "feet [were] on fire." (Tr. 649). Carter similarly complained to Dr. Terris that she had "a lot of burning on the soles of both feet." (Tr. 325). Dr. Terris diagnosed *corns and callouses* as well as neuropathy. (Tr. 325). Similarly, when Carter saw Dr. Gruber about pain in her feet, he diagnosed intractable plantar keratoma (Tr. 510), which means callouses in the feet. *See* Stedman's Medical Dictionary, p. 1024 (28th Ed. 2006) (defining "keratoma" as callouses). Thus, the ALJ had reason to believe that callouses contributed to the pain in Carter's feet.

Even if the primary cause of pain in Carter's feet was neuropathy, not callouses, this also had responded to treatment that Carter was not pursuing. (*See* Tr. 333 (reporting "significant improvement"). In 2012, Dr. Gruber, a podiatrist, recommended orthotics to address lingering issues of pain in her feet not fully resolved by the treatment for neuropathy. (Tr. 510). But Carter packed the orthotics away. (Tr. 513). In 2013, Carter was seeing Dr. Troisi, another podiatrist, for "calluses and foot problems." (Tr. 771). Dr. Troisi had recommended surgery, which Carter did not want at the time. (Tr. 783). Accordingly, the ALJ's ultimate point that the pain in Carter's feet (regardless of the primary cause) responds to treatment (not all of which Carter has pursued) is supported by substantial evidence.

### B. Credibly Established Limitations

Carter claims that the ALJ's RFC was defective because it was based on a hypothetical question that failed to include all of the Carter's credibly established limitations. (D.I. 14 at 23). A hypothetical question must include all of the claimant's "credibly established limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Accordingly, a limitation that is

16

supported by medical evidence, and "otherwise uncontroverted in the record," must be included in the hypothetical. *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). "However, where a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Id.* Here, Carter has not shown that the limitations omitted from the ALJ's hypothetical were credibly established limitations that the ALJ was obligated to include.

First, Carter claims that the ALJ's hypothetical question should have included the exact same limitations set forth in Dr. Pahwa's opinion, including, in particular, the inability to sit or stand longer than four hours, the need to elevate her legs 25% of the time, and being off task more than 25% of the time. (D.I. 14 at 25; Tr. 650-51, 701). But as explained above, the ALJ appropriately gave Dr. Pahwa's opinion "little weight," because it was inconsistent with objective medical evidence. Accordingly, the ALJ's hypothetical was not incomplete because it did not include all of Dr. Pahwa's limitations to the same degree of severity.

Second, Carter claims that the ALJ erred by not including limitations related to her depression and anxiety in her RFC. (D.I. 14 at 25). But Dr. Pahwa opinion that Carter had depression and anxiety were not uncontroverted. There are a few reports of depression in May and July of 2012 (Tr. 708-10, 716), but substantially more reports from both before and after this time of no depression or anxiety. (Tr. 356, 412, 441, 445, 449, 456 (no depression or anxiety in 2011); 661, 666, 670, 677, 706, 718 (no depression or anxiety in 2012); 623, 658, 742, 757, 762, 765, 783, 791, 795 (no depression or anxiety in 2013). In fact, Dr. Pahwa's own medical examination conducted on December 11, 2013 to complete the disability paperwork found no depression or anxiety. (Tr. 795). The fact that the medical examination and disability paperwork

17

completed on the same day are in conflict gives the ALJ ample reason to find that the limitations were not credibly established.

Finally, Carter claims that the ALJ failed to adequately account for her obesity in the RFC finding. (D.I. 14 at 25). The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. In December 2013, Carter had a BMI of 36.07. (Tr. 794). The ALJ accounted for Carter's obesity by formulating an RFC that required sedentary work. (Tr. 17-18). Carter has not pointed to any medical evidence suggesting that her obesity makes her incapable of even sedentary work. In fact, the record shows that Carter's past work involved sedentary jobs. (Tr. 71). Accordingly, the court finds that the RFC appropriately addresses all of Carter's credibly established limitations.

## C. Hypothetical Questions

Carter argues that the RFC was defective because it relied on a hypothetical question with limitations greater than the sedentary work required by the RFC. (D.I. 14 at 24). The hypothetical question provided that the individual could sit for 6 hours, walk for 3 hours, and lift 10 pounds frequently and 20 pounds occasionally. (Tr. 61). These limitations are not inconsistent with the definition of sedentary work.[5] The regulations define sedentary work as sitting, with walking and standing only occasionally required, and lifting no more than 10 pounds at a time. 20 C.F.R. § 404.1567. The regulations do not provide for a certain number of hours of sitting or walking. Carter's past jobs are categorized as sedentary and Carter testified that she performed them as

---

[5] Even if the limitations posed in the hypothetical questions are more appropriately characterized as light work, the ability to perform light work generally includes the ability to perform sedentary work. 20 C.F.R. §§ 404.1567(b), 416.967(b). Thus, the ALJ appropriately relied on the VE's testimony that Carter was capable of light work to find that Carter was also capable of sedentary work.

18

sedentary. (Tr. 46-48). Accordingly, there is no inconsistency between the hypothetical posed to the VE, Carter's RFC, and the ALJ's conclusion that Carter could return to her past work.

## V. CONCLUSION

For the foregoing reasons, (1) Carter's motion for summary judgment (D.I. 13) is denied; and (2) the Commissioner's motion for summary judgment (D.I. 18) is granted. An appropriate order will be entered.

Dated: July 5, 2016

_____
UNITED STATES DISTRICT JUDGE

19